**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JEFF SHIRING, INDIVIDUALLY ) | |
| AND ON BEHALF OF ALL OTHERS ) | |
| SIMILARLY SITUATED, ) | |
|       Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:06cv1276 |
| ) | |
| TIER TECHNOLOGIES, INC., et al., ) | |
|       Defendants. ) | |

**MEMORANDUM OPINION**

An important issue, appropriately addressed early in this securities fraud action brought pursuant to the Private Securities Litigation Reform Act ("PSLRA"),[1] is whether the alleged class of plaintiffs merits certification pursuant to Rule 23, Fed. R. Civ. P. For the reasons that follow, class certification is unwarranted because lead plaintiff, Jeff Shiring, has failed to satisfy the typicality and adequacy requirements of Rule 23.

**I.**

On December 14, 2005, Tier Technologies, Inc. ("Tier"), a NASDAQ-listed company and a national provider of transaction services, software, and systems integration services, announced to the investing public that it would delay filing its annual report for the fiscal year ending September 30, 2005 and that it expected to restate its historical financial results from September 30, 2002 to June 30, 2005. Following this announcement, Tier's stock price fell from a December 14th closing price of $7.93 per share to a December 15th closing price of $6.96 per share, a 12.2% drop in share value. Thereafter, Tier retained an independent law firm to conduct an investigation

---

[1] 15 U.S.C. § 78u-4.

of restatement-related issues. On October 24, 2006, following completion of this independent investigation, Tier published its restated historical financial statements for the fiscal years ending September 30, 2001, 2002, 2003, 2004, and for interim quarterly financial statements. Specifically, Tier restated its net annual income or loss for four fiscal years as follows:

|  | Net Income (Loss) From Continuing Operations | |
| --- | --- | --- |
|  | As Reported | As Restated |
| Fiscal Year 2001 | $2,951,000 | $1,538,000 |
| Fiscal Year 2002 | $7,305,000 | $6,713,000 |
| Fiscal Year 2003 | ($4,536,000) | ($5,436,000) |
| Fiscal Year 2004 | $1,754,000 | ($63,000) |

As often occurs when public companies restate earnings, Tier's restatement of earnings promptly spawned a securities fraud class action lawsuit. On November 9, 2006, only two weeks after Tier's restatement, plaintiff filed a complaint (the "First Complaint") alleging that Tier's original financial statements for fiscal years 2001 through 2004 contained fraudulent misrepresentations, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. In particular, plaintiff alleges that for each of the fiscal years in issue Tier and the individual defendants materially misrepresented Tier's financial condition to investors and failed to prepare its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). In this regard, plaintiff contends that "[t]he sheer volume of the accounts that were adjusted in violation of GAAP, coupled with [Tier's] admission of 'earnings management' demonstrates a deliberate intention on the part of Tier management to manipulate earnings." Compl. ¶ 151. This, plaintiff alleges, resulted in Tier falsely over-reporting net income and under-reporting net losses in both press releases and filings with the Securities and

Exchange Commission. As required by the PSLRA, 15 U.S.C. § 78u-4(a)(2),[2] plaintiff filed a sworn certification together with the First Complaint, stating, *inter alia*, that he had purchased 3,000 Tier shares on June 15, 2005 at a stock price of $8.50 per share. On the basis of this certification and the allegations contained in the First Complaint, plaintiff moved for certification of a plaintiff class encompassing all persons or entities who acquired Tier stock from November 29, 2001, the date Tier initially published its September 30, 2001 financial statement, to October 26, 2006, the date Tier announced its financial restatement. Additionally, plaintiff filed a motion for appointment as lead plaintiff, which was granted, pursuant to 15 U.S.C. § 78u-4(a)(3), as no other individual or entity had sought appointment as lead plaintiff or objected to plaintiff's appointment as lead plaintiff. *Shiring v. Tier Technologies, Inc.*, No. 1:06cv1276 (E.D. Va. Jan. 26, 2007) (Order). By the same Order, plaintiff's attorneys, the Rosen Law Firm, P.A. and John C. Pasierb, PLC, were approved as lead counsel and local counsel, respectively, all pursuant to 15 U.S.C. § 78u-4(a)(3)(B). *Id.*

Thereafter, plaintiff filed a First Amended Complaint omitting one defendant, Tier's current Chief Financial Officer, and reducing the proposed class period by several months to

---

[2]In particular, 15 U.S.C. § 78u-4(a)(2) provides that a plaintiff "seeking to serve as a representative party on behalf of a class shall provide a sworn certification," that

> (i) states that the plaintiff has reviewed the complaint and authorized its filing;
> (ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action . . .
> (iii) states that the plaintiff is willing to serve as a [class] representative . . .
> (iv) *sets forth all transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;*
> (v) identifies any other action under this title . . . in which the plaintiff has sought to serve as a [class] representative . . .; and
> (vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery . . . .

(emphasis added).

November 29, 2001 through May 24, 2006, the date Tier announced it had been de-listed from NASDAQ. Based on this reduced class period, plaintiff alleged that he suffered $8,310 in actual damages as a result of Tier's material misrepresentations.[3] In addition, to reflect the reduced class period, plaintiff filed an amended motion for class certification and appointment as class representative, seeking to certify a class, pursuant to Rules 23(a) and (b)(3), Fed. R. Civ. P., consisting of:

> All persons or entities who purchased or otherwise acquired the Class B common stock of Tier Technologies, Inc. between November 29, 2001 and May 24, 2006 and who were damaged thereby.

Appended to this motion was plaintiff's PSLRA sworn certification, stating that he had purchased 3000 Tier shares on June 15, 2005 at a stock price of $8.50 per share.

In the course of class certification discovery plaintiff testified that he is currently employed by Enviro Solutions, Inc., a waste management company, as the Vice President of Financial Reporting, in which capacity he is responsible for generating financial reports and preparing the company's financial statements. Plaintiff further testified that he purchased his Tier stock on May 25, 2005, at a price of $8.46 per share, acknowledging that the two sworn certifications previously filed in this matter were inaccurate; he had certified in each of these that he had purchased his Tier stock on June 15, 2005 at a stock price of $8.50 per share. Additionally, plaintiff, in his deposition testimony also explained the circumstances of his Tier stock purchase. In this respect, plaintiff testified that in May 2005 he began to research Tier on the web, in particular examining its

---

[3] Plaintiff has conceded, however, that his actual damages may be smaller depending on how the class period is defined. For example, plaintiff's actual damages would be $2,550 if the class period were to end on December 14, 2005, the date Tier announced that it would delay filing its annual report for the fiscal year ending September 30, 2005 and the date it expected to restate certain historical financial results.

financial statements and earning history. Plaintiff then revealed that on May 5, 2005, twenty days prior to his Tier stock purchase, he had applied for a financial consultant position at Tier. Plaintiff also disclosed that on May 6, 2005, the day following his application to Tier for a financial consultant position, he interviewed with several Tier employees, including David Fountain, Tier's Chief Financial Officer. Specifically, plaintiff admitted that the information he learned about Tier during this Tier interview played a part in his decision to purchase Tier stock, stating in particular as follows:

> Q. Did the information that you learned as part of this interview process and so on, did that play a part in your decision to purchase Tier stock?
> A. It did, specifically my conversation with David [Fountain].

Shiring Dep. 52:10-15, Mar. 10, 2007. Plaintiff further testified that he met with Fountain "several times" and spoke "about the value of the stock and where it was going," and that Fountain "did a good job of presenting the strengths of the company, of which, of course, was the balance sheet, their great cash position, and their limited debt." *Id.* at 52:19-22, 61:11-12, 62:17.[4]

On May 25, 2005, plaintiff accepted Tier's offer of employment and was retained as a Tier business consultant. In accepting Tier's employment offer, plaintiff signed agreements titled Nondisclosure and Proprietary/Confidential Information/Nonsolicitation and Tier Human Resources Employee Information. In substance, these agreements required, *inter alia*, that plaintiff

---

[4] In addition, plaintiff testified:

> Q. [D]id you mention the fact that you thought Tier was an attractive opportunity to purchase stock or anything along those lines?
> A. That was the specific conversation that I had with David Fountain about the company.

Shiring Dep. 60:15-21.

obtain "pre-clearance" of all stock transactions involving Tier stock.[5] Nevertheless, on the same day that plaintiff signed these agreements he purchased Tier stock without obtaining the required Tier "pre-clearance." Finally, plaintiff disclosed that his tenure at Tier was quite brief; after only three days of employment he resigned on May 27, 2005, to accept a permanent position with Enviro Solutions, his current employer.

In addition to the testimony related to his Tier stock purchase, plaintiff also testified regarding his role as lead plaintiff and putative class representative in the instant litigation. To begin with, plaintiff explained that following Tier's December 2005 restatement of earnings he became concerned about his investment, but did not then take any steps to initiate litigation. In particular, plaintiff testified that the restatement did not prompt him to conduct an investigation or otherwise research the circumstances surrounding Tier's restatement. Instead, Tier's restatement merely prompted him to "change[] the frequency in which [he] looked at [the] stock and notes about [the] stock through the internet." Shiring Dep. 95:2-6. Approximately two months later, plaintiff read a press release distributed by the Rosen Law Firm concerning Tier's restatement and contacted the firm. Plaintiff testified that after consulting with the Rosen Law Firm he was motivated to file the instant suit. *Id.* at 96:3-7.

With respect to the First Complaint, plaintiff testified that he provided no comments on the drafts he had seen. Moreover, plaintiff admitted that he did not know what positions the named

---

[5]In particular, Tier's Securities Trades Policy provides that:

> All transactions in Company stock (including purchases, sales, gifts, transfers, etc.) by any employee . . . must be pre-approved in writing by our legal department. You must submit a Trading Authorization form . . . and receive legal approval before making any transaction in the Company's stock at any time. . . . If you contemplate a transaction, you should contact our legal department at least 5 working days before you intend to make a transaction.

defendants held at Tier and that he could not explain why those persons had been selected as defendants. In this respect, he stated that "[s]ome of that I defer to counsel, when they decide or think through who is appropriate [to name as a defendant]." *Id.* at 101:8-10. Plaintiff testified, in general, he relied on information from and communications with counsel to monitor and manage the litigation. *Id.* at 108. In particular, when asked what documents he planned to review going forward plaintiff responded "again, I'll rely on the Rosen Law Firm to communicate information to me and let me know what's required of me." *Id.* at 109:1-3. As to the filing of the First Amended Complaint, plaintiff testified that he recalled it omitted one defendant, David Fountain, but plaintiff was not specifically aware of the reduced class period or the reason for the change in the class period.

Following his deposition, plaintiff sought leave to amend the First Amended Complaint and Motion for Class Certification. According to plaintiff, unbeknownst to him and to lead counsel, plaintiff's local counsel's license to practice law in the courts of the Commonwealth of Virginia was revoked on February 6, 2007. Despite the loss of his law license, Pasierb, on February 23, 2007, filed and endorsed the First Amended Complaint and Motion for Class Certification on plaintiff's behalf. Approximately one month later, Pasierb informed lead counsel that he wished to withdraw from the action for health reasons and suggested two potential replacement attorneys. Next, on March 30, 2007, one of the potential replacement attorneys informed lead counsel that Pasierb had recently been disbarred. According to plaintiff, this was the first time that lead counsel had become aware of Pasierb's disbarment. Thus, two weeks later plaintiff sought leave to amend the First Amended Complaint and Motion for Class Certification, arguing that, pursuant to Rule 15, Fed. R. Civ. P., leave to amend should be freely granted because neither plaintiff nor lead counsel were aware of Pasierb's disbarment. Because such amendment comported with Rule 15's liberal

7

amendment standard, plaintiff's unopposed motion was granted. *Shiring v. Tier Technologies, Inc.*, 1:06cv1276 (E.D. Va. May 4, 2007) (Order). Accordingly, on May 7, 2007 plaintiff filed a Corrected First Amended Complaint (the "Complaint") and Corrected Motion for Class Certification, containing a signature block properly endorsed by an admitted attorney of the Eastern District of Virginia. It is this corrected class certification mmotion that is at issue here.

## II.

The principles governing the certification of plaintiff classes pursuant to Rule 23, Fed. R. Civ. P., are well-established. To begin with, the party moving for class certification bears the burden of demonstrating that the proposed class meets the requirements of Rule 23. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). In this regard, Rule 23 instructs courts to determine whether or not to certify a class at "an early practicable time" and provides a two-step procedure for analyzing the certification issue. *See id.; Lutz v. Int'l Assoc. of Machinists and Aerospace Workers,* 196 F.R.D. 447, 450 (E.D.Va. 2000). In the first step, the movant must satisfy the threshold requirements contained in Rule 23(a), namely (1) that the class is so numerous that joinder of all members would be impracticable; (2) that questions of law or fact are common to the class; (3) that the claims or defenses of the representative party are typical of those of the class; and (4) that the representative party fairly and adequately protect the interests of the class. *Id.* If the party seeking certification satisfies these requirements, then it must demonstrate that the proposed class fits within one of the Rule 23(b) categories. *Id.*[6] In the end, this two-step procedure requires

---

[6] Here, as is typical of securities fraud cases, plaintiff contends that this case falls within category (b)(3), that is, he claims that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed. R. Civ. P.

a district court to engage in a "rigorous analysis" to determine "whether the representative parties should be allowed to prosecute the claims of absent class members." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 359, 367 (4th Cir. 2004).[7] For the reasons that follow, class certification is unwarranted here because (i) plaintiff's claims are not typical and (ii) plaintiff is an inadequate class representative.[8]

### A.

As stated above, Rule 23, Fed. R. Civ. P., requires that plaintiff demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." A representative's claim is "typical" when the class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *Leinhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001). Yet, even where a putative class representative's claim is "typical," "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *see J. H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 998-99 (7th Cir. 1980) (explaining that unique defense rule exists because "[t]he fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer"). Significantly, to defeat class certification "it is not necessary that the [unique]

---

[7]*See General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982) (emphasizing that a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied").

[8]Defendants concede that plaintiff has satisfied the first two requirement for class certification – numerosity and commonality. Indeed, in securities fraud cases the numerosity and commonality requirements are often undisputed where, as here, the fraud allegations arise out of a public company's restatement of earnings. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538-39 (E.D. Va. 2006).

9

defense asserted against the putative class representative ultimately succeed." *McNichols v. Loeb Rhoades & Co., Inc.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982). Instead, "the presence of even *an arguable defense* peculiar to the named plaintiff . . . may destroy the required typicality . . . ." *J. H. Cohn*, 628 F.2d at 999 (emphasis added).

In this case, defendants contend that class certification is unwarranted because plaintiff is subject to a unique defense, namely that he purchased his Tier stock based on information he obtained from Fountain during his Tier interview rather than on publicly available information. This is an important point because a plaintiff cannot prevail under § 10(b) of the Securities Exchange Act and Rule 10b-5 without proof that the plaintiff "justifiably relied" on defendants' false statements, knowingly made in connection with the sale of a security. *Gariety,* 368 F.3d at 362 (quoting *Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 (4th Cir. 1999)). And to establish justifiable reliance, plaintiff in this case, as do plaintiffs in most securities fraud actions, relies on the "fraud-on-the-market" doctrine, which provides a presumption that a plaintiff "who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," which, in turn, depends on the accuracy of the publicly available information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Importantly, this presumption of reliance may be rebutted "[i]f a purchaser of stock relies on non-market information that is not generally available to the public, and hence to the unnamed class representatives." *Grace v. Perception Tech. Corp.,* 128 F.R.D. 165, 169 (D. Mass. 1989). Thus, where, as here, plaintiff relies on the fraud-on-the-market doctrine to establish typicality, any reliance on non-market information means that "he cannot be said to have relied on the integrity of the market, and is atypical of those who have so relied." *Id.* ("[I]f a plaintiff has

relied on non-market information that plaintiff may be subject to unique defenses at trial.").[9]

Here, defendants correctly contend that plaintiff's claims are atypical because it is arguable that, in purchasing his Tier stock, plaintiff relied not on publicly available market information, but rather on representations made by Tier's Chief Financial Officer. As a factual matter, defendants' contention finds firm support in the record. Thus, it is undisputed that plaintiff had face-to-face meetings with several Tier employees and, in particular several conversations with David Fountain, Tier's Chief Financial Officer. Significantly, plaintiff conceded that the information he learned about Tier during these meetings, and especially his conversations with Fountain, influenced his decision to purchase Tier stock. Shiring Dep. 52:10-15, Mar. 10, 2007. As plaintiff explained, he met with Fountain "several times," and during these conversations they spoke "about the value of the stock and where it was going." *Id.* at 52:19-22, 61:11-12, 62:17. Plaintiff testified that he "specifically" discussed with Fountain "the fact that [he] thought Tier was an attractive opportunity to purchase stock," and that Fountain "did a good job of presenting the strengths of the company . . . ." *Id.*

And, as a matter of law, defendants' contention is equally well-supported in the decided cases. Indeed, "[c]ourts have routinely found a disqualifying unique defense where the potential named plaintiff has had a direct or personal relationship with a board member or officer of the

---

[9]*See In re Indep. Energy Holdings PLC*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002) ("[W]here plaintiffs are privy to non-public information not available to other investors, they may be subject to unique reliance defenses making them atypical and inadequate class representatives."); *McNichols*, 97 F.R.D. at 337 (noting that courts have "recognized that the defense of nonreliance on the integrity of the market when raised against the named plaintiff in a fraud on the market case may destroy the typicality of his or her claims") (citing *Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.Y. 1981); *Kline v. Wolf*, 88 F.R.D. 696 (S.D.N.Y. 1981); and *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y. 1978)).

issuing company." *In re Indep. Energy Holdings PLC*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002).[10]

To illustrate, one district court found that a putative class representative's claims were subject to a unique defense, and thus atypical, where he had had a face-to-face meeting with a senior officer of the company that left him "with a very forward feeling," and prompted him to buy company stock. *Beck*, 1995 U.S. Dist. LEXIS 9978, at *8. While the putative class representative argued that the defendant did not provide him with "inside information," the court nonetheless concluded that this did not "alter the fact that his claim is atypical. . . . because the fact remains that [plaintiff] will be required to devote considerable time to rebut the unique defense." *Id.* at 11. Thus, the court emphasized that "it does not matter whether a unique defense ultimately will prove meritorious," instead, the presence of an arguable defense is sufficient to find atypicality. *Id.* Similarly, another district court reached the same result with respect to a putative class representative who relied on conversations with friends and associates in purchasing the stock. In finding a lack of typicality, the district court there noted that

> [w]hether the information to which these individuals had access would be relevant to a decision to purchase [the company's] securities, and whether plaintiffs actually relied on such information in their decision to purchase, are difficult factual questions which cannot be resolved at this stage of the litigation. However, whether these defenses will be successful is of no matter. The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members.

*Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).[11] As these cases demonstrate, "[p]ersonal contact with corporate officers and special meetings at the

---

[10]*See e.g., Beck v. Status Game Corp.*, No. 89 Civ. 2923, 1995 U.S. Dist. LEXIS 9978 (S.D.N.Y. 1995); *Grace,* 128 F.R.D. 165; *Zandman v. Joseph,* 102 F.R.D. 924 (N.D.Ind. 1984); *Priest v. Zayre Corp.,* 118 F.R.D. 552, 555 (D. Mass. 1988); *Landry*, 123 F.R.D. 474.

[11]*See In re Indep. Energy Holdings PLC*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002); *McNichols*, 97 F.R.D. at 340 ("[A]ll defendant must do to establish the atypicality of the named plaintiffs' claims is show that there is an arguable defense against them that is inapplicable to the remainder of the class and that threatens to become a primary issue in the litigation.").

company will render a plaintiff atypical to represent the class," even where factual questions exist as to whether plaintiff obtained inside information as a result of this personal contact. *Grace,* 128 F.R.D. at 169. This principle, applied here, compels the conclusion that plaintiff's claims are subject to a unique defense, and thus, are atypical. Plaintiff's own testimony clearly demonstrates that he will be subject to a unique defense, that is, defendants will assert that plaintiff, unlike other class members, cannot avail himself of the fraud-on-the-market doctrine because he purchased his Tier stock in reliance on the non-market information he received from Fountain, rather than in reliance on the integrity of the market. *See Beck*, 1995 U.S. Dist. LEXIS 9978, at *10-11 (finding defense unique to the putative class representative because the absent class members did not have conversations with senior officers of the company before purchasing their stock). As in both *Beck* and *Landry* the presence of this arguable defense to plaintiff's claim of market reliance could become the subject of considerable litigation, and thus, renders plaintiff's claims atypical, regardless of whether defendants will ultimately prove that plaintiff received non-market information. Accordingly, plaintiff's motion for class certification must be denied.

**B.**

Even assuming, *arguendo*, that plaintiff could leap over the typicality hurdle, his motion for class certification would nonetheless founder on Rule 23's adequacy requirement. Pursuant to Rule 23(a)(4), plaintiff must demonstrate that he will fairly and adequately protect the interests of the class. This adequacy requirement is meant to protect the due process rights of absent class members who will be conclusively bound by the judgment in this case. 1-14A Moore's Manual-- Federal Practice and Procedure § 14A.25[1]. Accordingly, to ensure that the rights of absent class members are protected, Rule 23 requires that the putative class representative must "have a sufficient interest in the outcome of the case to ensure vigorous advocacy" and "not have interests

antagonistic to those of the proposed class."[12] *Id.* To assess whether plaintiff has a sufficient interest in this action, that is, whether plaintiff is an adequate representative, several factors require consideration, including his " honesty, conscientiousness, and other affirmative personal qualities."[13] 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1766 (2007).[14] Thus, if plaintiff "displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied." *Id.*

> Distilled to its essence the adequacy inquiry focuses on two questions:
>
> (i) has plaintiff demonstrated the requisite level of knowledge and control of the litigation to ensure that he will vigorously prosecute the claims asserted here and
>
> (ii) has plaintiff demonstrated the requisite credibility to ensure that he will act as a fiduciary with respect to the class he seeks to represent.

In conducting this two-part inquiry it is important to bear in mind that "[a]dequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001).

---

[12] It is worth noting that the adequacy requirement also applies to the putative class representative's attorneys. In this respect, Rule 23 requires that the representative's attorneys must be qualified, experienced, and generally able to conduct the litigation. 1-14A Moore's Manual-- Federal Practice and Procedure § 14A.25[1]. In this case, defendants do not dispute the adequacy of plaintiff's counsel, and accordingly, the issue need not be addressed.

[13] Notably, the presence of a unique defense, as discussed *supra*, may be an additional basis for holding that plaintiff is not an adequate representative. *See* 1-14A Moore's Manual--Federal Practice and Procedure § 14A.25[4] ("If the class representative is subject to a defense unique to the representative that potentially will become a focus of the litigation, the class representative will not satisfy the adequacy of representation requirement. The justification for this principle is that the class representative may become distracted by the presence of a unique defense, causing plaintiff's representation of the class to be placed at a disadvantage.").

[14] *Cf.* 1-14A Moore's Manual--Federal Practice and Procedure § 14A.25[7] ("Whether there is adequate representation of all class members is a question of fact that primarily depends on the circumstances of each case.").

With respect to the first question – whether plaintiff has demonstrated sufficient knowledge and control of the litigation – it is important to underscore that in the securities fraud context the adequacy inquiry must be particularly searching. This is so because the PSLRA was "intended to empower investors so that they, not their lawyers, control securities litigation . . . [and to change the existing system, in which] investors in the class usually have great difficulty exercising any meaningful discretion over the case brought on their behalf. . . ." S. Rep. 104-98, at *6 (1995);[15] *see Berger*, 257 F.3d at 484 ("[I]n complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases."). Accordingly, the knowledge and control requirement is satisfied only where plaintiff demonstrates that he understands the action in which he is involved and, notably that this "understanding [is] not . . . limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483.[16] In this regard, courts have found a putative class representative to be inadequate, *inter alia*, where he relied on counsel to identify the proper defendants, where he could not articulate specific facts supporting the claims against most of the defendants, where he conducted little to no research regarding the suitability of class counsel, and where he did not

---

[15]*See In re Cendant Corp.*, 260 F.3d 183, 197 (3d Cir. 2001) (emphasizing that the purpose of the PSLRA is to ensure that securities fraud actions are driven by investors, rather than lawyers); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 218 (2d Cir. 2000) (same); *In re Microstrategy Inc. Securities Litigation*, 110 F. Supp. 2d 427, 435 n.14 (E.D. Va. 2000) (same); 7-92 Securities Law Techniques § 92.05 ("'The [PSLRA] was intended to prevent 'lawyer-driven' litigation, and to ensure that parties with significant financial interests in the litigation will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel.").

[16]*See Krim v. PCOrder.Com, Inc.*, 210 F.R.D. 581, 587 (W.D. Tx. 2002) (holding two putative class representatives inadequate because their understanding of the action was limited to derivative knowledge acquired from attorneys); *Ogden v. Americredit Corp.*, 225 F.R.D. 529 (N.D. Tx. 2005) (holding that putative class representative was inadequate because there were "many instances in which she has little or no knowledge outside of that given to her by her attorneys").

contribute to the drafting of the complaint. *See e.g.*, *Ogden v. Americredit Corp.*, 225 F.R.D. 529 (N.D. Tx. 2005); *Griffin v. GK Intelligent Sys. Inc.,* 196 F.R.D. 298, 302 (S.D. Tx. 2000) (holding plaintiffs were inadequate class representatives because they were not familiar with many of the substantive allegations in the complaint and were not adequately supervising counsel); *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991) (holding that plaintiff was inadequate representative where he lacked knowledge about the allegations in the complaint and did not contribute to its drafting).

It is pellucidly clear from his deposition testimony that plaintiff is an inadequate class representative. This is so because plaintiff has not demonstrated that he, rather than his counsel, is in control of the litigation. In this regard his deposition testimony reveals that, although concerned about his investment following the Tier restatement, plaintiff elected to pursue litigation only after responding to a press release distributed by the Rosen Law Firm and even then based only on the Rosen Law Firm's investigation and research. Moreover, after initiating litigation plaintiff took no significant steps to supervise this action, opting not to participate in the drafting of the First Complaint or in the decision of which individuals to name as defendants. Perhaps as a result of this inaction, plaintiff's deposition testimony demonstrates a lack of knowledge regarding the allegations contained in the Complaint. For example, plaintiff, it appears from his deposition, was not aware of the positions held at Tier by all of the named defendants, could not explain why those defendants were selected, and was not specifically aware of the reduced class period in the First Amended Complaint, or the reason for its reduction. As plaintiff candidly stated, this was because he "defer[s] to counsel" in these matters. Additionally, plaintiff's testimony reveals that he will continue to defer to counsel, relying on information from and communications with counsel to monitor and manage the litigation. As these examples illustrate, plaintiff has effectively abdicated

16

his supervisory role, choosing instead to allow counsel to manage and control the litigation, in contravention of the PSLRA's stated goals. In light of this, plaintiff is not an adequate class representative.[17] *See Ogden,* 225 F.R.D. at 534-35 (finding putative class representative inadequate because her knowledge was limited to that provided by counsel).

Nevertheless, even assuming plaintiff's lack of knowledge and control of the litigation were not fatal to this motion, plaintiff is inadequate because he has not demonstrated the requisite credibility to ensure that he will act as an appropriate fiduciary. As noted, "[a]s a fiduciary for the class, [plaintiff class representative] . . . [is] required to adhere to the highest standards of honesty and integrity." *Weisman v. Darneille* 78 F.R.D. 669,671 (S.D.N.Y. 1978). Thus, to be appointed class representative, a plaintiff must demonstrate that he exhibits "honesty, conscientiousness, and other affirmative personal qualities." 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1766 (2007).

Defendants correctly contend that plaintiff, on this record, fails to meet this standard. In this respect, defendants point out that plaintiff, on two occasions, filed sworn certifications in this action falsely stating that he had purchased 3,000 Tier shares on June 15, 2005 at a stock price of $8.50 per share when, in fact, he had purchased his Tier stock on May 25, 2005, at a price of $8.46 per share. Plaintiff's inadvertence or his indifference to the PSLRA's certification requirements demonstrates a lack of diligence and candor that, in conjunction with his other deficiencies,

---

[17]It is also worth mentioning that an additional reason supporting plaintiff's inadequacy is his failure to investigate properly the suitability of local counsel, Pasierb. *See Ogden*, 225 F.R.D. at 535 (holding that plaintiff was inadequate class representative based, in part, on her failure to conduct any research regarding the suitability of class counsel).


counsel against a finding of adequacy.[18]  *See* 7-92 Securities Law Techniques § 92.05 (noting that "[c]ourts have precluded named plaintiffs from serving as class representatives because of failure to comply with the certification requirements"); *Darvin v. Int'l Harvester Co.,* 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (noting that credibility problems provide a basis for denying plaintiff's motion to be named class representative).  Accordingly, as plaintiff has failed to demonstrate the requisite standards of honesty and integrity required of a fiduciary for the putative class, he is an inadequate representative.

In sum, plaintiff's motion for class certification must be denied because plaintiff has not satisfied his burden of demonstrating that his claims are typical of the class he seeks to represent and that he is an adequate class representative.  This does not mean, of course, that plaintiff is in any way disabled from individually pursuing his own securities fraud claim against defendants.  Indeed, he may certainly do so in this case; what he may not do, for the reasons stated here, is to represent a class of persons seeking to assert such claims.

An appropriate Order will issue.

Alexandria, Virginia  
July 23, 2007

_____/s/_____  
T. S. Ellis, III  
United States District Judge

---

[18]Notably, defendants also point out that plaintiff's failure to comply with Tier's insider trading policy, which required pre-clearance for employee purchases of Tier stock, provides further support for finding that plaintiff lacks the affirmative personal qualities required of a class representative.  It is unnecessary to decide whether plaintiff's violation of Tier's employee policy and breach of his employment agreement were deliberate or the result of inadvertence; in either case, the episode underscores his failure to demonstrate that he possesses the honesty required of a fiduciary.